**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Carrie Ann Marshall,<br><br>            Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin,<br>Acting Commissioner of Social Security,<br><br>            Defendant. | No. CV-14-02463-TUC-BGM<br><br>**ORDER** |

Currently pending before the Court is Plaintiff's Opening Social Security Brief Filed Pursuant to LRCiv. 16.1 (Doc. 12). Defendant filed her Brief ("Response") (Doc. 19), and Plaintiff filed her Reply Social Security Brief Filed Pursuant to LRCiv. 16.1 ("Reply") (Doc. 22). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

. . .

. . .

## I.      BACKGROUND

### A.      *Procedural History*

On September 19, 2011, Plaintiff filed an application for Social Security Disability Insurance Benefits ("DIB") alleging disability as of January 1, 2004 due to chronic pain, multiple foot surgeries, arthritis, and a pain management implant (spinal cord stimulator). *See* Administrative Record ("AR") at 24, 26, 41, 43, 54–56, 58–60, 65–67, 78, 83, 113, 126, 140, 167, 176, 178, 182, 183, 189.  Plaintiff's date last insured was December 31, 2009.  *Id.* at 24, 26, 54–55, 59, 65–67, 78, 83, 126, 167, 176, 190.  The Social Security Administration ("SSA") denied this application on January 17, 2012.  *Id.* at 24, 54–64, 78–82.  On March 9, 2012, Plaintiff filed a request for reconsideration, and on August 10, 2012, SSA denied Plaintiff's application upon reconsideration.  *Id*. at 65–76, 82, 83–86. On September 18, 2012, Plaintiff filed her request for hearing.  *Id.* at 24, 86.   On February 15, 2013, a hearing was held before Administrative Law Judge ("ALJ") Laura Speck Havens.  AR at 24, 37–53.  On March 28, 2013, the ALJ issued an unfavorable decision.  *Id.* at 21–33.   On May 18, 2013, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on September 9, 2014, review was denied.  *Id.* at 1– 3, 20.  On November 6, 2014, Plaintiff filed this cause of action.  Compl. (Doc. 1).

### B.      *Factual History*

Plaintiff was forty-four (44) years old at the time of the administrative hearing and thirty-four (34) at the time of the alleged onset of her disability.  AR at 32, 37, 41, 55, 66, 113, 126, 167, 176, 189.   Plaintiff obtained a high school diploma and attended approximately one year of college.  *Id.* at 32, 42, 141.  Prior to her alleged disability,

Plaintiff worked as a software purchasing manager.  *Id.* at 32, 44, 63, 118–19, 141–42, 159–61.  Since that time she has worked briefly as a front desk clerk, in payroll, and as a promotions assistant.  *Id.* at 30, 32, 42–43, 119–20, 130–32, 159–66.

On December 6, 2011, Plaintiff filled out an Exertional Daily Activities Questionnaire, indicating that on an average day she does "light house work [sic][,] grocery 1/week approx [sic] 1 Hour[,] [and] cook [sic] maybe once a day[.]"  *Id.* at 155.  Plaintiff reported that her "pain limits [her] ability to do much for any length of time — standing, sitting, walking[,] [and] [w]eather changes make the pain much worse."  AR at 155.  Plaintiff further reported that she "no longer ha[s] any stamina and [she] do[esn't] sleep but about 5 hours/week."  *Id.*  Plaintiff indicated that her "spinal cord stimulator [i]mplant . . . limits her lifting . . . [to not] more than 50 [pounds]."  *Id.* at 156.  Plaintiff reported doing laundry, cooking, or cleaning once per week.  *Id.*  Plaintiff further reported being able to drive a manual transmission for approximately one hour.  *Id.*  Plaintiff also indicated that she is unable to sleep, and although she is tired during the day, she is unable to take naps.  AR at 155.  Throughout the report, Plaintiff stressed her previous high level of activity as compared with her current condition.  *Id.* at 155–57.

On appeal, Plaintiff completed a Disability Report – Appeal (Form SSA-3441), indicating that "[a]s a result of the surgeries, [she] periodically get stress fractures in [her] feet."  *Id.* at 178.  Plaintiff further reported that "this happens on a semi-regular basis[,] . . . [which] has been a fairly regular occurrence since completing the foot surgeries."  *Id.*  Plaintiff also stated that "[i]n addition to physical stress, this causes tremendous emotional stress for both [her]self and [her] husband."  *Id.* at 179.  Plaintiff reported

doing "less and less around the house[,] [and] [her] husband is responsible for most of the cleaning, cooking[,] and overall household maintenance."   AR at 182.   Additionally, Plaintiff stated that she "never know[s] in advance how [she] will be feeling[,] . . . mak[ing] planning ahead almost impossible."  *Id*.  Plaintiff reported not getting "more than 10 hours of sleep in a week as a result of this."  *Id.* at 183.

### 1. Plaintiff's Testimony

At the administrative hearing, Plaintiff testified that she has a high school diploma and approximately one (1) year of college, is able to read the newspaper, and perform simple adding and subtracting.  AR at 42.  Plaintiff further testified that she was fired in 2004, because she was unable to perform her duties and was let go.  *Id.*  Although she filed for unemployment benefits at that time, she did not receive them.  *Id.*  Plaintiff also testified that since that time she worked briefly for Arizona Natural Woman and then for Citadel Broadcasting.  *Id.* at 42–43.  Plaintiff confirmed that she suffers from arthritis, chronic pain, and depression.  *Id.* at 43.

Plaintiff testified that in the 2004–2009 time frame, she was on "fairly heavy doses of morphine[.]"  AR at 44.  As a result, she "was really inconsistent."  *Id.*  Plaintiff testified that she occasionally did household chores, including small amounts of cooking, dish washing, laundry, and grocery shopping.  *Id.* at 44–45.  Plaintiff further testified that she was able to dress and bathe herself.  *Id.* at 45.  Plaintiff also testified that she enjoyed making jewelry, but was only able to sit for approximately forty-five (45) minutes to an hour at a time.  *Id.*  Plaintiff also testified that she watched approximately three (3) hours of television per day, did not exercise, and drove infrequently.  AR at 45–46.

- 4 -

Plaintiff testified that she had problems eating and sleeping, reporting some stomach issues due to medications and "terrible, terrible insomnia." *Id.* at 46. Plaintiff further testified only sleeping approximately ten (10) to (twelve) hours per week. *Id.* Plaintiff also testified that she was on several medications during the 2004–2009 time period, including Percocet, OxyContins, morphine, Promethazine, Temazepam, Cyclobenzapril, Naproxen Sodium, and Lexapro. *Id.* at 47–48. Plaintiff testified that she saw a therapist once or twice per week during the same period. *Id*. at 48.

Plaintiff estimated that she had eleven (11) surgeries from 2004–2009. AR at 48. Plaintiff testified that most of these were to her right foot, but the last "batch were for a . . . neurotransmitter." *Id.* at 49. Plaintiff further testified that she was able to walk or stand for very short periods and was wheelchair bound for approximately three (3) months after one surgery. *Id.* Plaintiff also testified that the pain in her feet made it difficult to sit. *Id*. at 49–50. Plaintiff testified that she cannot lift more than fifty (50) pounds due to the stimulator. *Id.* at 50. She described her daily pain level during the 2004–2009 period, while on medication, as a seven (7) out of ten (10), with ten (10) being the worst pain. AR at 50. Plaintiff further described the pain as sharp and shooting. AR at 50.

Plaintiff testified that since 2009 her condition has improved because she is no longer recovering from surgeries, but "gotten worse overall." *Id.* at 51. Plaintiff further testified that the fusion in her foot causes back and ankle problems, the weather bothers her due to her arthritis, and although the "box in [her] back is helpful for the nerve pain, . . . it hurts being . . . , like sitting." *Id.* Plaintiff also testified that the loss of her job was probably the "hardest part" for her, and that she began seeing a therapist again

approximately one (1) year prior to the hearing to cope with the depression.  *Id.* at 51–52.
Plaintiff testified that she stopped taking all of the opiates in 2010, but "since then the
insomnia has gotten worse."  *Id.* at 52.  Plaintiff further testified that the insomnia causes
her to be unable to "think straight" or concentrate.  *Id.*

### 2. Lay Witness Testimony

Plaintiff's husband, Robert Marshall, did not testify at the administrative hearing,
but the ALJ accepted a February 15, 2003 letter written by him into evidence.  AR at 40,
185–87.  Mr. Marshall described his wife as "a determined and motivated person."  *Id.* at
185.  Mr. Marshall also reported that "living with extreme flexibility ha[d] become [their]
'new' reality."  *Id.* at 187.

### 3. Plaintiff's Medical Records

On January 23, 2003 by Ira L. Gluck, D.C. at Catalina Chiropractic Center.  AR at
300–4.  Her neurological assessment was unremarkable.  *Id.* at 302.  Upon orthopedic
examination, Mr. Gluck noted moderate restriction in Plaintiff's right and left lateral
flexion of her cervical spine, as well as mild restriction of rotation right and left.  *Id.* at
302–3.  Additionally, Mr. Gluck noted neck pain upon compression test of Plaintiff's
cervical spine in lateral flexion right and left.  *Id.* at 303.  Mr. Gluck further noted spasm,
tenderness, articular fixation, and malposition of Plaintiff's spine upon clinical
examination, assessing cervicobrachial syndrome; cervical myalgia/myofascitis; and
thoracic rib/intercostal strain.  *Id.*  Plaintiff saw Mr. Gluck regularly in 2003, there are no
records for 2004, but Plaintiff returned in 2005.  AR at 307–8.  The bulk of Mr. Gluck's
Clinical Evaluation summaries, however, are dated in 2008.  *Id.* at 309–18.

On January 23, 2004, Plaintiff saw Ario Keyarash,[1] M.D. for a "follow-up of her first MTP [(Metatarsophalangeal)] fusion." *Id.* at 222. Dr. Keyarash reported that Plaintiff was "doing better after her desensitization and physical therapy[,] [but] [s]he continues to have some pain including what appears to be transfer of metatarsalgia under the second metatarsal head[,] [and] . . . great toe pain." *Id.*

On March 24, 2004, Plaintiff followed-up with Dr. Keyarash for "her right foot multiple surgeries." *Id.* at 221, 364, 426. Dr. Keyarash reported that she "ha[d] started to have problems involving the second and third and fourth metatarsals[,] [but] [h]er first ray is doing well[,] [and] [she] ha[d] no symptomatology." AR at 221, 426. Dr. Keyarash further reported "[o]n physical examination . . . [Plaintiff] ha[d] palpable tenderness markedly on the second, third and fourth metatarsal shafts with palpable callus." *Id.* Dr. Keyarash assessed "[s]tress fractures to the right foot[,]" although the x-rays did not show any fractures. *Id.* Dr. Keyarash placed Plaintiff in a walking boot. *Id.* On the same date, Dr. Keyarash dictated a letter to Sun Life Financial regarding Plaintiff's long term disability claim. *Id.* at 219–20. Dr. Keyarash outlined Plaintiff's previous bunion surgery and subsequent complications, as well as the corrective surgeries that he performed. AR at 219. Dr. Keyarash further reported that Plaintiff had "developed multiple stress fractures of the same foot . . . [and] that from the time of her original surgery up to now she has been unable to ambulate on her right foot, and to operate a motor vehicle, as she has been in a boot or a cast." *Id.*

---

[1] Dr. Keyarash is alternatively noted as Ario Kiarash, M.D. in the Administrative Record, these names will be used interchangeably.

On April 8, 2004, Plaintiff saw Dr. Keyarash "for evaluation of her old walking boot." *Id.* at 217. Dr. Keyarash reported that "[t]here was no evidence of new injury, wounds or skin breakdown . . . [and] [a] new walking static boot was provided" to Plaintiff. *Id.* On April 21, 2004, Plaintiff again saw Dr. Keyarash and "[s]he report[ed] that most of the pain in her lesser toe metatarsals ha[d] decreased." *Id.* at 216, 364, 425. Dr. Keyarash "told her that for the time being since her symptoms are improving we will continue current management . . . [and she should] wean herself out of the boot within the next couple of weeks." AR at 216, 425.

On May 21, 2004, Plaintiff saw Dr. Keyarash "for follow-up after her stress injury to the second and third metatarsals." *Id.* at 215, 364, 424. Plaintiff "report[ed] that she continues to have significant pain in the ball of her foot involving her metatarsal heads . . . starting mostly under the second and then transferring more and more to the outside." *Id.* at 215, 424. Dr. Keyarash reported "[o]n physical examination the wounds are benign[,] [t]here is no erythema, induration, no drainage[,] [but] [s]he does have significant tenderness to palpation under her metatarsal heads." *Id.* Dr. Keyarash assessed "[s]ignificant metatarsalgia with clear mechanical reasons after her multiple surgeries[,]" and indicated that Plaintiff was "a candidate for Weil osteotomy of all the metatarsals[.]" *Id.*

On June 21, 2004, Plaintiff was seen by Michael C. Jean, M.D. regarding epigastric discomfort, including pain, nausea, and vomiting. AR at 422–23. On June 22, 2004, Plaintiff underwent an abdominal ultrasound regarding the epigastric pain, nausea, and vomiting. *Id.* at 372. The ultrasound was normal, "with no evidence of gallstones or

biliary dilatation." *Id.*

On July 6, 2004, Plaintiff had surgery at the Tucson Orthopedic Institute Surgical Facility. *Id.* at 225–27. Dr. Keyarash performed a metatarsophalangeal capsulotomy and tenorrhaphy on Plaintiff's second through fifth toes of her right foot; a Weil osteotomy of Plaintiff's second through fifth metatarsals of her right foot; and a resection of the head, proximal phalanx of Plaintiff's right, second toe. *Id.* at 214, 225–26. On July 16, 2004, Plaintiff saw Dr. Keyarash for "her first postoperative visit after MTP capsulotomy tenorrhaphy with second through fifth toes with Weil osteotomies and resection of the head of the proximal phalanges of the second toe." AR at 213, 421. Dr. Keyarash reported that "[o]n physical examination the wounds are benign[,] [n]o erythema, induration and no drainage[,] [and] [t]he pin sites are clear." *Id.* Dr. Keyarash also reported that the "[x]-rays show well reduced deformities with hardware in place[,] [and Plaintiff was] doing well." *Id.*

On August 11, 2004, Plaintiff underwent an air contrast upper GI study, which was normal. *Id.* at 371. On August 13, 2004, Plaintiff saw Dr. Keyarash "for her second postoperative visit after MTP capsulotomy and tenorrhaphy, second through fifth toes Weil osteotomies and resection of the head of the proximal phalanx of the second toe." *Id.* at 212, 363, 420. Dr. Keyarash reported that "[o]n physical examination, the wounds are benign[,] [n]o erythema or induration[,] [n]o drainage[,] . . . [with] some swelling which is appropriate for her stage of healing postop." AR at 212, 420. Plaintiff's "[x]-rays show well-reduced deformities with hardware in place[,] [and] [t]he fifth metatarsal osteotomy is not completely healed . . . [and she is] [i]mproving postoperatively. *Id.* On

August 23, 2004, Plaintiff was seen regarding her medications. *Id.* at 363.

On September 13, 2004, Plaintiff again saw Dr. Keyarash "for follow-up of her right foot surgeries." *Id.* at 211. Plaintiff reported "that her symptomology has improved . . . [and] she has been a little more tolerant weightbearing on the involved foot[,] . . . [but] reports . . . still ha[ving] significant pain at the end of the day." *Id.* Dr. Keyarash reported that "[o]n physical exam wounds are benign[,] [n]o erythema, induration[,] . . . [or] drainage." AR at 211. Dr. Keyarash further reported that Plaintiff "ha[d] swelling which is appropriate for her stage of healing postop[,] [with] [t]he extensor tendons . . . still not functioning quite well . . . [and] [x]-rays show[ing] well healing corrected forefoot deformities." *Id.* On September 15, 2004, Dr. Keyarash wrote a second letter to SunLife Insurance Company to assist "in reevaluating [their] original assessment." AR at 208. Dr. Keyarash reported that Plaintiff's "current level of impairment and limitations are more severe now than they were at the time of her inability to return to work on those three occasions stated." *Id.* Dr. Keyarash further reported that Plaintiff could "stand and walk for about one hour a day maximum with 10-15 minute intervals followed by rest." *Id.* at 209. Dr. Keyarash also stated that "[a]s far as her sitting ability, she can sit for about two hours before she has to elevate her foot[,] [o]therwise the patient has to be in a reclined position with her foot elevated to decrease the swelling." AR at 209. Dr. Keyarash indicated that "[f]or the duration [Plaintiff] has been on narcotics mostly in the form of Percocet tablets[,] [and] [d]ue to the effect of these medications her cognitive function has also been effected including her ability it [sic] think clearly, speak clearly, type clearly and perform her normal job functions required in her position." *Id.* Plaintiff

- 10 -

received samples of Lexapro this same date, and again on October 11, 2004. *Id.* at 363.

On November 10, 2004, Plaintiff followed-up with Dr. Keyarash regarding her Weil osteotomies. *Id.* at 206. Dr. Keyarash reported that "[o]n physical examination the wounds are benign[,] [n]o erythema, induration and no drainage." *Id.* Dr. Keyarash further reported that Plaintiff "continues to have some swelling and she continues to be tender to palpation under her metatarsal heads, especially under the fifth one and fourth one[,] . . . [which] corresponds to an area where the screw seems to be extending too far from her Weil osteotomy." AR at 206. Dr. Keyarash assessed "[s]ymptomatic hardware" and "plan[ned] for removal." *Id.* On November 15, 2004, Plaintiff received samples of Lexapro. *Id.* at 362. On November 23, 2004, Dr. Keyarash removed the deep implant in Plaintiff's right foot as the hardware had become painful. *Id.* at 205, 223–24.

On December 8, 2004, Plaintiff followed-up with Dr. Keyarash regarding "her hardware removal[.]" *Id.* at 204, 419. Dr. Keyarash reported that "[o]n physical examination the wounds are benign[,] [n]o erythema, induration and no drainage[,] [and] . . . no tenderness on palpation on the plantar aspect of [Plaintiff's] foot." AR at 204, 419. Dr. Keyarash assessed that Plaintiff was "[d]oing well postop." *Id.* On December 21, 2004, Plaintiff received samples of Lexapro and Flexeril. *Id.* at 362. On December 30, 2004, Plaintiff follow-up with Dr. Keyarash was noted stating Plaintiff was "doing well[.]" *Id.*

On January 7, 2005, Plaintiff returned to Dr. Keyarash for another follow-up "of her hardware removal." *Id.* at 203. Dr. Keyarash reported "[o]n physical examination, the patient is tender to palpation in her first intermetatarsal space[,] [and] [p]lantarly, the

pain that was under the screw head is gone."  AR at 203.  Dr. Keyarash assessed that Plaintiff "is coming along nicely."  *Id.*  On January 11, 2005, Plaintiff received a prescription for Flexeril.  *Id.* at 362.  On February 15, 2005, Plaintiff again received samples of Lexapro and Flexeril.  *Id.* at 362.

On March 18, 2005, Plaintiff returned to Dr. Keyarash "for a final visit for evaluation of her left foot."  *Id.* at 202, 416.  Plaintiff "report[ed] [that] she is more functional than she has been for a long time."  *Id.*  Dr. Keyarash reported that "[o]n physical examination today she ambulates much better in terms of her gait but she continues to complain of pain mostly under the first and second rays[,] [and] [l]aterally most of her pain is gone."  AR at 202, 416.  Dr. Keyarash further reported that Plaintiff's "[x]-rays show consolidation of all of her osteotomies[,] [and] [a]lignment of the lesser toes is optimal."  *Id.*  Dr. Keyarash assessed "[c]ontinued residual symptomatology, first ray right foot, after multiple operations . . . [and] discharge[d] her from care."  *Id.*  On March 22, 2005, Plaintiff was seen regarding her allergies.  *Id.* at 362.  Plaintiff received samples of Lexapro and a prescription for Flexeril.  *Id.*

On June 8, 2005, Plaintiff returned to Dr. Keyarash "for follow-up of her foot pain."  AR at 201, 415.  Plaintiff "report[ed] that she has been doing well[,] [but] . . . has had some pain under the fifth metatarsal."  *Id.*  Dr. Keyarash reported that "[o]n physical examination plantarly under the fifth metatarsal the patient has some prominence and there is also a little prominent area under the fourth metatarsal which more closely represents the patient's area of symptomatology."  *Id.*  Dr. Keyarash planned to "treat her symptomatology only."  *Id.*  On June 14, 2005, Plaintiff was seen at Pima Osteopathic for

foot pain following surgery.  *Id.* at 360.

On September 10, 2005, Plaintiff followed-up with Dr. Kiarash regarding her foot. AR at 231.  Examination showed normal gait, normal range of motion in the ankle, sutalar joint, midfoot, and in the MTP joints bilaterally.  *Id.* at 231, 326.  Dr. Kiarash noted that Plaintiff's first MTP was "still a little more tender and stiff."  *Id.*  On September 12, 2005, Plaintiff underwent a "[r]ight middle trigger finger release."  *Id.* at 230, 232–43.  Dr. Kiarash performed the surgery, which was unremarkable.  *See id.*  On September 15, 2005, Plaintiff received a prescription for Flexeril and one for Citalopram the following day.  AR at 360.  On September 23, 2005, Plaintiff followed up with Southwest Orthopaedic Surgery Specialists regarding the trigger finger release surgery. *Id.* at 322.  Patient notes indicate that her "[w]ound is benign, no erythema, enduration, drainage, there is swelling, which is normal for stage of heeling [sic] post op."  *Id.*

On October 21, 2005, Plaintiff returned to Southwest Orthopaedic Surgery Specialists for follow-up reporting "her trigger finger improved a couple of weeks ago and she has had no episodes of triggering."  *Id.* at 323.  Patient notes indicate that the "[w]ound is benign, no erythema, enduration, drainage, there is swelling, which is normal for stage of heeling [sic] post op."  *Id.*  On November 15, 2005, Plaintiff received a prescription for Piroxicam.  AR at 360.

On December 21, 2005, Plaintiff was seen at Southwest Orthopaedic Surgery Specialists for a follow-up.  *Id.* at 324.  Plaintiff reported that she was "[v]ery happy with the trigger finger relief."  *Id.*  Plaintiff further reported that "she has had problems with her foot[,] and [h]as a new job working payrol [sic]."  *Id.*

On March 13, 2006, Plaintiff was seen by Judy A. Hiell, N.M.D. for an initial consultation regarding Plaintiff's recent weight gain, foot pain, depression, and for a general check-up. *Id.* at 248–55, 462. On April 10, 2006, Plaintiff sought samples of Lexapro and Flexeril. AR at 360. Plaintiff also saw NMD Hiell on the same date regarding her weight gain, continued foot pain, and depression. *Id.* at 463. On April 11, 2006, Plaintiff was seen regarding her medications and was given prescriptions for Ultracet and Percocet. *Id.* at 361.

On May 9, 2006, Plaintiff received a prescription for Vicodin. *Id.* at 361. On May 23, 2006, Plaintiff followed up at Southwest Orthopaedic Surgery Specialists regarding surgery on her right foot. *Id.* at 325. Plaintiff reported that she "continues to have pain, [with] no significant change since last visit." AR at 325. Assessment of Plaintiff's foot was unremarkable, but the first MTP was noted to "still [be] a little more tender and stiff." *Id.* Plaintiff was referred for pain management. *Id.* On May 10, 2006, Plaintiff saw NMD Hiell for a check-up, including a rash on her lower face area. *Id.* at 464. On May 25, 2006, Plaintiff received a prescription for Temazepam. *Id.* at 359.

On July 10, 2006, Plaintiff was seen by NMD Hiell. AR at 465. Plaintiff complained that her "foot really bother[s] her a lot [with] weather changes[.]" *Id.* Plaintiff further reported that her facial rash went away on its own. *Id.* Plaintiff was began homeopathies for her night sweats and hot flashes. *Id.* On July 25, 2006, Plaintiff saw Randall S. Prust, M.D. regarding her "right foot pain, particularly across the dorsal surface of the MTP joint associated with skin sensitivity, temperature changes, color changes, and increased pain upon walking that feels like it is in the bones." *Id.* at 411–

13.  In describing her history to Dr. Prust, Plaintiff reported that "[t]he pain is generally worse in the afternoon, evening, and night[,] [and] [i]t does interrupt her sleep[,] [and] [s]he tosses and turns somewhat."  AR at 411.  Upon physical examination, Dr. Prust noted "edema between [Plaintiff]s] first and second digit tarsal area consistent with where the end of the screw is[.]"  *Id.* at 412.  Dr. Prust further reported "range of motion limited at the toes with skin sensitivity to light touch on the dorsum of the foot, slightly more than the plantar surface of the foot[,] [and] [n]o other edematous areas noted."  *Id.*  Plaintiff's "[r]ange of motion of the ankle is full [,] [but] [t]he patient does some guarding[,] [s]he keeps her foot dorsiflexed instead [of] in a neutral position when sitting."  *Id.* at 413.  Plaintiff's assessment include the "possibility of complex regional pain syndrome, type I reflex sympathetic dystrophy in the area" which was to be ruled out using a lumbar sympathetic block.  *Id.*

On August 15, 2006, Plaintiff saw Randall Prust, M.D. regarding her right foot pain.  AR at 410.  Dr. Prust's impressions included "[c]omplex regional pain syndrome, type 1 (reflex sympathetic dystrophy), right lower extremity[;] . . . [p]ossible neuralgia, right lower extremity[;] . . . [s]tatus post multiple foot surgeries[;] [and] GERD [(gastroesophageal reflux disease)]."  *Id.*  Dr. Prust performed a lumbar sympathetic block on the right and Plaintiff "had total pain relief following the block with no more allodynia or hypersensitivity."  *Id.*  On August 23, 2006, Plaintiff saw NMD Hiell for a check up.  *Id.* at 466.

On September 8, 2006, Plaintiff was seen by Dr. Prust regarding her right foot pain.  AR at 407–08.  Plaintiff reported not having had any long-term results.  *Id.* at 407.

Plaintiff also reported that "since her last visit, she developed a headache the next day after the [lumbar sympathetic] block." *Id.* Dr. Prust opined that "[g]iven the fact that she had 100% pain relief initially after the block but it did not last, [he] [was] not inclined to do more blocks but [] certainly would like to consider the [spinal cord] stimulator." *Id.* at 408. On September 18, 2006, Plaintiff saw NMD Hiell for a check-up. *Id.* at 467. On September 22, 2006, Plaintiff again saw Dr. Prust regarding her right foot pain. AR at 406. Plaintiff returned to discuss a spinal cord stimulator. *Id.*

On October 18, 2006, Plaintiff's records indicate that she was told by Dr. Prust and PA Judkins to consider a spinal cord stimulator. *Id.* at 359. On November 3, 2006, Plaintiff received a prescription for Flexeril. *Id.* at 359. On November 27, 2006, four (4) views of Plaintiff's lumbar spine were taken. *Id.* at 370. "There [was] no evidence of fracture or dislocation[,] [and] [d]isk spacing [was] maintained." AR at 370.

On December 21, 2006, Plaintiff saw Dr. Prust regarding her right foot pain, which "was gone essentially with the stimulator, but it stopped working." *Id.* at 401. After the temporary lead had been placed "she was virtually totally pain-free." *Id.* After discussing what had happened prior to the unit ceasing to work, Dr. Prust decided to "do a fluoroscopy . . . and the leads [were] pulled back all the way out of the epidural space." *Id.* Dr. Prust opted for a permanent system in light of her previous excellent result. *Id.* On December 28, 2006, Plaintiff was again seen by Dr. Prust regarding her foot pain, and was "70% to 75% better overall." AR at 398–99. Dr. Prust noted that he had "spent a long time discussing her medicines with her . . . she was using a 120 Percocet every couple of weeks with Dr. Kiarash and she is down to using 15 to 20 per week now[,]

[s]he was very pleased with the results of the stimulator and the fact she had it done." *Id.* at 398.   Dr. Prust reported that "[n]eurologically, [Plaintiff] [was] markedly improved as far as allodynia and hypersensitivity and the wounds are clean and dry with no evidence of infection." *Id.*   Dr. Prust removed the sutures and taught Plaintiff how to reprogram the spinal cord stimulator.  *Id.*

On February 6, 2007, Plaintiff received a prescription for Percocet.  *Id.* at 356.   On February 12, 2007, Plaintiff was seen at Rincon Anesthesia regarding her "right foot pain, much improved with the spinal cord stimulator."  AR at 397.   Plaintiff's "[s]pinal cord stimulator was reprogrammed" in an attempt "to see if she could get some better stimulation into the foot[.]"  *Id.*   On March 5, 2007, Plaintiff received 10 mg samples of Lexapro.  *Id.* at 356.   On April 9, 2007, Plaintiff asked to pick up prescriptions for Percocet, Allegra, and Temazepam, and received samples of Requip and Lexapro.  *Id.* at 355.

On May 8, 2007, Plaintiff returned to Southwest Orthopaedic Surgery Specialists for an "evalation [sic] of her left knee."  *Id.* at 327.   Plaintiff reported that her "knee has bothered er [sic] over the past 6 months."  AR at 327.   Plaintiff rated her pain as between 2–4 on a scale of 1 through 10, with 10 being the worst pain.  *Id.*   Review of the knee was unremarkable, and the treatment plan indicated that "[w]hile [Plaintiff's] symptoms are minimal . . . they may be exacerbated by her left foot problems and the fact that she favors that side."  *Id*.   There was no need for "management medically or surgically" and Plaintiff was instructed "to get on an exercise bike or walk in a pol [sic] to keep the knee ROM [(range of motion)] intact."  *Id.*   On May 21, 2007, Plaintiff received prescriptions

for Percocet and Requip, as well as additional samples of Lexapro.  *Id.* at 355.

On June 7, 2007, Plaintiff received samples of Requip.  AR at 355.  On June 19, 2007, Plaintiff was given prescriptions for Lexapro and Percocet.  *Id.*  On June 21, 2007, Plaintiff was given a prescription for Phenergan.  *Id.*  On July 30, 2007, Plaintiff was given a prescription for Percocet, as well as Lexapro samples.  *Id.*  On August 17, 2007, Plaintiff was given samples of Lexapro and Requip.  *Id.*  On August 20, 2007, Plaintiff was given a prescription for Temazepam.  AR at 355.  On August 29, 2007, Plaintiff received a prescription for Percocet.  *Id.*

On October 2, 2007, Plaintiff received samples of Lexapro and Requip, as well as prescription for Percocet and Roxicodone.  *Id.* at 354.  On October 19, 2007, Plaintiff's chart indicates an upcoming appointment regarding a possible pain patch.  *Id.*  On October 24, 2007, Plaintiff was seen regarding medication concerns and received a prescription for OxyContin.  *Id.* at 353.  On October 25, 2007, Plaintiff received samples of Lexapro.  AR at 353.

On November 1, 2007, Plaintiff received a prescription for Promethazine.  *Id.* at 352.  On November 5, 2007, Plaintiff received samples of Lexapro.  *Id.*  On November 6, 2007, Plaintiff received prescriptions of OxyContin and Roxicodone.  *Id.*  On November 21, 2007, Plaintiff received additional samples of Lexapro and Requip.  *Id.*  On November 21, 2007, Plaintiff received another prescription for Roxicodone.  AR at 352.  On December 6, 2007, Plaintiff received a prescription for OxyContin.  *Id.*  On December 11, 2007, Plaintiff received a prescription for Percocet, and samples of Lexapro and Requip the following day.  *Id.* at 351.  On December 27, 2007, Plaintiff received

additional samples of Lexapro and a written prescription for the same the next day.  *Id.* at 350.

On January 10, 2008, Plaintiff was seen for a medication consult, she received prescriptions for Lexapro, Temazepam, and Raxicodone at or shortly before the appointment.  *Id.*  Plaintiff was given a five (5) day prescription of MS Contin.  AR at 350.  On January 21, Plaintiff received a prescription for MS Contin.  *Id.* at 349.  On January 22, 2008, Plaintiff returned to Southwest Orthopaedic Surgery Specialists for bilateral foot pain.  *Id.* at 328.  Plaintiff was seen by Jason M. Humphrey, P.A.-C., who assessed a non-infectious ingrown toenail on Plaintiff's right great toe and metatarsalgia at her left 2nd metatarsal, which was tender on examination.  *Id.*  On January 30, 2008, three views of Plaintiff's right foot were taken.  *Id.* at 369.  "Postoperative changes [were] described[,] . . . [and] [n]o fracture or other bony abnormalities [were] seen."  AR at 369.  On February 21, 2008, Plaintiff received a prescription for MS Contin.  *Id.* at 349.  On February 26, 2008, Plaintiff was seen regarding her medications.  *Id.*  On March 20, 2008 Plaintiff received a prescription for MS Contin and samples of Lexapro.  *Id.* at 348.  On April 9, 2008, Plaintiff received a prescription for Promethazine and one for Cyclobenzaprine the following day.  *Id.* at 347.  On April 14, 2008, Plaintiff received samples of Lexapro and Levoxyl.  AR at 347.  On April 21, 2008, Plaintiff received a prescription for MS Contin and Temazepam.  *Id.*  On April 28, 2008, Plaintiff was seen by Kenneth Judkins, P.A.-C. and Randall Prust, M.D. regarding her right foot pain.  *Id.* at 457–58.  PA Judkins reports that Plaintiff "has stabilized under medications with the use of the stimulator."  *Id.* at 457.  Plaintiff reported that "she gets 50% pain relief with the

stimulator, with morphine . . . [s]he is up all of the other 50% covered." *Id.* Plaintiff further reported that "[s]he is using the Celebrex more for her knees and her foot at this point." AR at 457. PA Judkins reported "allodynia on light touch[,] [and] . . . some edema in the area of the foot." *Id.*

On May 6, 2008, Plaintiff was seen by Dr. Kiarash for "follow up of right foot pain[,]" which Plaintiff reported was unchanged and generalized. *Id.* at 329. Dr. Kiarash's review was unremarkable, noting "[i]t is a year after the last visit and she still has problems with her contralateral foot and knee due to favoring her right foot." *Id.* Plaintiff was also seen by Sander D. Zwart, M.D. on this same date regarding her hypothyroidism. *Id.* at 390–91. On May 19, 2008, Plaintiff received a prescription for MS Contin. AR at 346.

On June 4, 2008, Plaintiff received samples of Levoxyl and Lexapro, then received a prescription for Roxicodone the following day. *Id.* at 346. On June 17, 2008, Plaintiff received a prescription for MS Contin. *Id.* Plaintiff also underwent a Computerized Tomography ("CT") Scan of her cervical spine and head, this same date, as a result of a motor vehicle collision. *Id.* at 367–68. A "mild reversal of cervical lordosis" was noted, but "[n]o evidence of fracture of [sic] subluxation[,] [n]o prevertebral soft tissue swelling[,] [and] [t]he facet joints [were] normally aligned." *Id.* at 367. "There [was] a slight osseous ridging at C5-6 and C6-7[,] [but] [n]o significant osseous canal or foraminal compromise." AR at 367. Additionally, the CT showed "no acute intracranial hemorrhage[,] [n]o mass effect or midline shift[,] [n]o hydrocephalus[,] . . . [and] [n]o edema in the brain parenchyma." *Id.* at 368. The CT scan was otherwise

- 20 -

unremarkable.  *Id.*  On June 19, 2008, Plaintiff received a prescription for Promethazine. *Id.* at 346.

On July 9, 2008, Plaintiff saw NMD Hiell for a check-up.  *Id.* at 468.  Plaintiff reported being in a motor vehicle accident the prior month.  AR at 468.  Plaintiff complained of fatigue, weight issues, constipation, tightness in her hips and shoulders, poor sleep, cold feet, dry skin, and memory issues.  *Id.*  On July 17, 2008, Plaintiff received a prescription for MS Contin.  *Id.* at 346.  On July 18, 2008, Plaintiff was rear ended in a motor vehicle accident.  *Id*. at 345.  Plaintiff exhibited whiplash symptoms and was given a prescription for Flexaril.  *Id.*  On the same date, Plaintiff received a prescription for Lexapro.  AR at 345.  On July 28, 2008, Plaintiff saw PA Judkins and Dr. Prust regarding her continuing right foot pain.  *Id.* at 455–56.  Plaintiff reported having been in a motor vehicle accident since her last appointment.  *Id.* at 455.  Plaintiff further reported that her right lateral ankle hurt, and the notes indicate that there was "a little swelling . . . probably consistent with sprain-strain in the ankle."  *Id.*  Plaintiff reported using herbal formulations, and her physical examination was otherwise unremarkable. *Id.*  Plaintiff was seen on the same date by NMD Hiell and discussed her continuing symptoms of perimenopause.  AR at 469.

On July 26, 2010, PA Humphrey entered a note reviewing Plaintiff's August 8, 2008 x-rays.  *Id.* at 330.  PA Humphrey noted that the x-rays showed "a well healed and stable 1st MTP fusion with multiple screws at the fusion as well as what appears to be a distal osteotomy."  *Id.*  PA Humphreys further noted that software and hardware issues in the office resulted in the office notes associated with Plaintiff's August 8, 2008 and

September 17, 2008 visits becoming irretrievable. *Id.* On August 15, 2008, Plaintiff received a prescription for MS Contin, as well as samples of Lexapro. *Id.* at 345. On August 28, 2008, Plaintiff was seen by PA Judkins and Dr. Prust regarding her "continuing right foot pain." AR at 453–54. Plaintiff reported to "doing well with her digestive supplements." *Id.* at 453. Plaintiff further reported "that the last set of storms hurt her much less than typical and she is doing well[,] [but] needs some reprogramming with the stimulator." *Id.* PA Judkins notes that Plaintiff is "[o]therwise, stable and stationary." *Id.* On August 27, 2008, Plaintiff was seen by NMD Hiell. *Id.* at 470. Plaintiff complained of memory issues and discussed dietary changes. AR at 470.

On September 12, 2008, Plaintiff received a prescription for MS Contin. *Id.* at 345. On September 16, 2008, Plaintiff received prescriptions for Cyclobenzaprine and Temazepam. *Id.* at 344. On October 17, 2008, Plaintiff received a prescription for MS Contin. *Id.* at 344. On November 12, 2008, Plaintiff saw NMD Hiell and discussed her perimenopause symptoms. *Id.* at 471. On November 14, 2008, Plaintiff received a prescription for MS Contin and samples of Lexapro. AR at 344. On November 24, 2008, Plaintiff received a prescription for Percocet for her break through pain. *Id.*

On December 3, 2008, Plaintiff was seen by PA Judkins and Dr. Prust regarding her continued right foot pain. *Id.* at 451–52. Plaintiff reported a "continued pain at a level of 3 in the right toes." *Id.* at 451. Plaintiff reported using a variety of herbal supplements which "give[] her more pain relief with less stomach problems." *Id.* On December 4, 2008, Plaintiff saw NMD Hiell for a check-up, and again on December 15, 2008. AR at 472. On December 12, 2008, Plaintiff received a prescription for MS

Contin.  *Id.* at 344.  On December 18, 2008, Plaintiff received a prescription for Restoril and one for Percocet the following day.  *Id.*

On January 9, 2009, Plaintiff received prescriptions for MS Contin and Roxicodone.  *Id.* at 344.  On January 14, 2009, Plaintiff was seen regarding her medications and neck pain.  *Id.* at 343.  On January 22, 2009, Plaintiff received a prescription for Avinza.  AR at 343.  On February 19, 2009, Plaintiff received prescriptions for Avinza and Oxycodone.  *Id.*  On February 23, 2009, Plaintiff received a prescription for Percocet for break through pain.  *Id.*  On March 5, 2009, Plaintiff received a prescription for Temazepam.  *Id.* at 342.  On March 13, 2009, Plaintiff received a prescription for Avinza.  *Id.*  On April 9, 2009, Plaintiff received a prescription for Avinza and Lexapro.  AR at 342.  On April 29, 2009, Plaintiff saw NMD Hiell for a check-up.  *Id.* at 473.

On May 6, 2009, Plaintiff received a prescription for Avinza and samples of Lexapro.  *Id.* at 342.  On June 4, 2009, Plaintiff received a prescription for Avinza.  *Id.*  On July 2, 2009, Plaintiff received a prescription for Avinza.  *Id.* at 341.  On July 10, 2009, Plaintiff received a prescription for Restoril.  AR at 341.  On July 23, 2009, Plaintiff received prescriptions for Cyclobenzaprine and Promethazine.  *Id.*  On July 31, 2009, Plaintiff received a prescription for Avinza.  *Id.*  On August 4, 2009, Plaintiff received prescriptions for Percocet and Restoril.  *Id.* at 341.  On August 27, 2009, Plaintiff received a prescription for Avinza and samples of Lexapro.  *Id.*

On September 3, 2009, Plaintiff received prescriptions for Restoril and Promethazine.  AR at 341.  On September 11, 2009, Plaintiff received a prescription for

Promethazine.  *Id.* at 340.  On September 14, 2009, Plaintiff received a prescription for Cyclobenzaprine.  *Id.*  On September 25, 2009, Plaintiff received prescriptions for Avinza and Percocet.  *Id.*  On October 8, 2009, Plaintiff received a prescription for Cyclobenzaprine.  AR at 340.  On October 12, 2009, Plaintiff received a prescriptions for Promethazine and another for Cyclobenzaprine.  *Id.*  On October 16, 2009, Plaintiff received a prescription for Restoril.  *Id.*  On October 20, 2009, Plaintiff received a prescription for Promethazine.  *Id.*  On October 27, 2009, Plaintiff was seen regarding her medications.  *Id.* at 339.

On November 4, 2009, Plaintiff saw NMD Hiell for a check-up.  AR at 474.  Plaintiff reported sleeping a lot, as well as weight gain.  *Id.*  On November 9, 2009, Plaintiff received a prescription for Cyclobenzaprine.  *Id.* at 339.  On November 20, 2009, Plaintiff again saw NMD Hiell regarding her diet, decreased energy, weight gain, and hot flashes.  *Id.* at 475.  On November 23, 2009, Plaintiff received another prescription for Cyclobenzaprine.  *Id.* at 338.  On November 25, 2009, Plaintiff received a prescription for Avinza.  AR at 339.  On November 30, 2009, Plaintiff received a prescription for Temazepam.  *Id.* at 338.

On December 3, 2009, Plaintiff was seen by PA Judkins and Dr. Prust for her right foot pain.  *Id.* at 449–50.  PA Judkins notes indicate that Plaintiff "was last seen on June 3, 2009 briefly, she has done well since then[,] [but] . . . continues to have some issues with pain about the middle of the early morning area."  *Id.* at 449.  PA Judkins further noted that Plaintiff "continue[d] to do well with the stimulator itself."  *Id.*  Additionally, Plaintiff reported "her pain is about 6 today[,] . . . the weather seems to have something

to do with this." AR at 449.  On December 16, 2009, Plaintiff received a prescription for

Lexapro.  *Id.* at 338.   On December 21, 2009, Plaintiff received a prescription for

Cyclobenzaprine.  *Id.*  On December 22, 2009, Plaintiff received prescriptions for Avinza

and Percocet.  *Id.*

On June 3, 2013, Dr. Prust filled out a Reflex Sympathetic Dystrophy

(RSD)/Complex Regional Pain Syndrome, Type I (CRPS) Medical Source Statement.[2]

*Id.* at 194–97.  Dr. Prust indicated that he had contact with Plaintiff from July 25, 2006 to

the present.  AR at 194.  Dr. Prust indicated that Plaintiff suffers from RSD/CRPS and

"persistent complaints of pain that are typically out of proportion to the severity of any

documented precipitant."   *Id.*    Dr. Prust indicated that Plaintiff had swelling,

osteoporosis, changes in skin color or texture, skin temperature changes, and involuntary

movements of the affected region at some point during his treatment of her.  *Id.*  Dr. Prust

also documented Plaintiff's right foot neuralgia and decreased range of motion with

fusion.  *Id.*  Dr. Prust's prognosis for Plaintiff was fair.  *Id*.  Dr. Prust indicated that

Plaintiff's impairments could be expected to last at least twelve (12) months and

identified her symptoms and signs as: burning, aching or searing pain initially localized

to the site of injury; increased sensitivity to touch; joint stiffness; restricted mobility;

muscle spasm; impaired appetite; abnormal sensations of heat or cold; muscle pain;

muscle atrophy; impaired sleep; and chronic fatigue.  AR at 194.  Dr. Prust also identified

associated limitations as: reduced ability to attend to tasks; reduced ability to persist in

tasks; depression; social withdrawal; and anxiety.  *Id.* at 195.   Dr. Prust indicated

---

[2] This is a check-the-box form.

drowsiness or sedation as a side effect of Plaintiff's medications.  *Id.*  Dr. Prust opined that Plaintiff could not walk the length of any city blocks without rest or severe pain, could sit for twenty (20) minutes at one time, and could stand for thirty (30) minutes at one time.  *Id.*  Dr. Prust further opined that Plaintiff could sit for approximately four (4) hours in an eight (8) hour work day, and stand or walk for about two (2) hours in the same day.  *Id.* at 195.  Dr. Prust opined that Plaintiff would need a job that permitted shifting positions at will from sitting, standing or walking, and would need to include periods of walking around during an eight (8) hour work day.  AR at 195.  Dr. Prust stated that Plaintiff must walk every ten (10) minutes for approximately ten (10) minutes. *Id.*  Dr. Prust opined that Plaintiff would need to take unscheduled breaks during the work day, and that this would occur more than every ten (10) minutes and Plaintiff would have to rest for ten (10) minutes before returning to work.  *Id.*  Dr. Prust stated that muscle weakness, chronic fatigue, and pain/paresthesias, numbness were the causes for a need for breaks.  *Id.* at 196.  Dr. Prust stated that Plaintiff's leg should be elevated to heart level for approximately three (3) hours of an eight (8) hour work day due to pain and swelling.  *Id*.  Dr. Prust opined that Plaintiff could frequently lift less than ten (10) pounds; occasionally lift ten (10) pounds; rarely lift twenty (20) pounds; and never lift fifty (50) pounds.  AR at 196.  Dr. Prust further opined that Plaintiff should rarely twist and stoop (bend) and should never crouch or squat.  *Id*.  Dr. Prust estimated that Plaintiff would be "off task" twenty-five (25) percent or more of the work day, but is capable of high stress work.  *Id*. at 197.  Dr. Prust opined that Plaintiff's impairments would likely produce "good days" and "bad days," and that these would occur more than four (4) days

per month.  *Id.*  Dr. Prust further opined that Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations listed, and that her limitations would have applied by at least December 31, 2009.  *Id.*

## II.  STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error.  42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).  This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'"  *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014).  Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).  Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ."  *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).  Moreover, the court may not focus on an isolated piece of

supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

## III.   ANALYSIS

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows:  Step one asks is the claimant "doing substantial gainful activity[?]"  If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]"  If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work.  If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience.  If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2009, and was not engaged in substantial gainful activity since her alleged onset date of January 1, 2004.  AR at 26.  At step two of the sequential evaluation, the ALJ found that "the claimant had the following severe impairments: arthritis; right foot chronic pain (20 CFR 404.1520(c))."  *Id.*  At step

three, the ALJ found that Plaintiff does "not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." *Id.* at 29.  At step four, the ALJ found that Plaintiff had:

> the residual functional capacity to perform a wide range [of] sedentary work; she was able to sit for 6 hours out of an 8-hour day; stand for 2 hours out of an 8-hour day; walk for 2 hours out of an 8-hour day; lift and/or carry 20 pounds occasionally and 10 pounds frequently; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel and crouch; never crawl.

*Id.*  The ALJ determined, however, that "claimant was unable to perform any past relevant work (20 CFR 404.1565)."  *Id.* at 32.  Accordingly, at step five, the ALJ found that "if the claimant had the residual functional capacity to perform the full range of sedentary work, considering the claimant's age, education, and work experience, a finding of 'not disabled' would be directed by Medical-Vocational Rule 201.28."  AR at 33.  The ALJ further found that "the additional limitations had little or no effect on the occupational base of unskilled sedentary work[,] [and] [a] finding of 'not disabled' is therefore appropriate under the framework of this rule."  *Id.*  Accordingly, the ALJ found that "[t]he claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2004, the alleged onset date, through December 31, 2009, the date last insured (20 CFR 404.1520(g))."  *Id.*

Plaintiff asserts that her DIB claim should not have been denied at Step Five, because the Appeals Council should have evaluated the Medical Source Statement of her treating physician, Randall Prust, M.D. pursuant to the standards set out in *Garrison v.*

1    *Colvin*, 759 F.3d 995 (9th Cir. 2014).  Pl.'s Opening Br. (Doc. 12) at 6.

2        **A.    *Non-reviewable Appeals Council Decision***

3

4            Plaintiff argues that the Appeals Council erred in its evaluation of the Medical

5    Source Statement submitted by Randall S. Prust, M.D.  Pl.'s Opening Br. (Doc. 12) at 6.

6    In denying Plaintiff's request for review, the Appeals Council stated that "[i]n looking at

7    your case, we considered the reasons you disagree with the decision and the additional

8    evidence listed."  AR at 1.  The Appeals Council "found that this information does not

9    provide a basis for changing the Administrative Law Judge's decision."  *Id.* at 2.

10

11           The Ninth Circuit Court of Appeals has unequivocally held that "we do not have

12   jurisdiction to review a decision of the Appeals Council denying a request for review of

13   an ALJ's decision because the Appeals Council decision is a non-final agency action."

14   *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1161 (9th Cir. 2012); *see also*

15   *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011).  "When the

16

17   Appeals Council declines review, 'the ALJ's decision becomes the final decision of the

18   Commissioner,' . . . and the district court reviews that decision for substantial evidence,

19   based on the record as a whole[.]"  *Brewes*, 682 F.3d at 1161–62 (citations omitted).

20

21   "[W]hen the Appeals Council considers new evidence in deciding whether to review a

22   decision of the ALJ, that evidence becomes part of the administrative record, which the

23   district court must consider when reviewing the Commissioner's final decision for

24

25   substantial evidence."  *Id.* at 1163 (citations omitted).

26           This Court does not have jurisdiction to review the Appeals Council's decision,

27   but must review the ALJ's decision based on the administrative record as a whole, which

28

now includes Dr. Prust's Medical Source Statement.  *See Brewes*, 682 F.3d at 1163; *see also Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014).

### B.      *The ALJ's Decision*

"Where 'the evidence can reasonably support either affirming or reversing a decision, we may not substitute our judgment for that of the [ALJ].'"  *Garrison v. Comm'r of Soc. Sec. Admin.*, 759 F.3d 995, 1010 (9th Cir. 2014) (citations omitted) (alterations in original); *see also Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) ("Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusions must be upheld").

### 1. Plaintiff's Credibility

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis."  *Lingenfelter v. Astrue*, 204 F.3d 1028, 1035–36 (9th Cir. 2007).  First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'"  *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).  Further, "the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom."  *Smolen*, 80 F.3d at 1282 (citations omitted).  "Nor must a claimant produce 'objective medical evidence of the

pain or fatigue itself, or the severity thereof.'"  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282).  "[I]f the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'"  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and convincing" requirement had been excised by prior Ninth Circuit case law).

"Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and 'unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment.'"  *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)); *see also Ghanim*, 763 F.3d at 1163.  "While ALJs obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must *in fact* constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard."  *Id.* at 1018 (emphasis in original) (discussing mental health records specifically).  "Inconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination.  *Burrell*, 775 F.3d at 1137 (citing *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

Here, the ALJ pointed to inconsistencies between Plaintiff's testimony and her

medical records stating:

> The claimant testified to severe functional limitations that affected her activities of daily living. However, the record does not support such limitations. The claimant reported in a March 2005 follow-up appointment with Dr. Ario Kiarash that she was more functional than she had been for a long time. She ambulated better in terms of gait. In September 2005, he reported that the claimant's gait was normal. She was able to heel and toe walk bilaterally. She was able to perform single stance heel rise bilaterally. Range of motion of the right ankle and mid foot was normal. Left knee symptoms were described as minimal in May 2007. Again, gait was normal and the claimant was able to heel and toe walk. Dr. Kiarash recommended riding an exercise bike or walking in a pool. Gait and strength in the lower extremities was reported as normal by Dr. Randall Prust in April 2008. The claimant reported to him to May 2010 that she had fallen off an elliptical machine. These facts are inconsistent with the claimant's testimony as to limited ability to do household chores or to exercise during the time period at issue.

AR at 30; *see also* AR at 42–52, 155–57, 178–83, 202, 231, 326–27, 416, 457–58. The ALJ further noted that "[d]iagnostic imaging is also inconsistent with disabling functional limitations[,]" relying on x-rays from May 2006, May 2007, and August 2008, as well as x-rays from July 2012. *Id.* at 31, 325, 327, 330. Finally, the ALJ noted that Plaintiff initially "reported a 70-75 percent relief of symptoms[.]" *Id.* at 31, 398–99. Subsequently, Dr. Kiarash "consistently reported pain relief at 50 percent with the most of the balance of the claimant's pain treated with narcotics." *Id.* at 31, 457. Plaintiff further "testified that she was able to wean herself from opiates independently by 2010." *Id.* at 31, 52. The ALJ concluded "that the claimant's testimony with regard to the severity and functional consequences of her symptoms is not fully credible." *Id.* at 31.

The Court finds that the ALJ stated sufficient specific reasons for not fully crediting Plaintiff's pain testimony, supported by substantial evidence. Moreover, Dr.

Prust's medical source statement does not change this assessment.  In the Medical Source Statement, Dr. Prust indicated that Plaintiff had swelling, osteoporosis, changes in skin color or texture, skin temperature changes, and involuntary movements of the affected region at some point during his treatment of her.  AR at 194.  The medical records do not contain any indication of osteoporosis or involuntary movements of the affected region.  Furthermore, at Dr. Prust's initial consultation with Plaintiff, Dr. Prust noted "edema between the first and second digit tarsal area consistent with where the end of the screw is . . . [n]o other edematous areas noted."  *Id.* at 412.  Dr. Prust also charted that Plaintiff's "[s]kin is slightly more dusky in coloration over the right versus the left, but no frank color changes."  *Id*. at 413.  On April 28, 2008, Plaintiff saw PA Judkins and Dr. Prust and reported that "she gets 50% pain relief with the stimulator, with morphine . . . [s]he is up all of the other 50% covered."  *Id.* at 457.  PA Judkins reported "allodynia on light touch[,] [and] . . . some edema in the area of the foot."  *Id.*  On July 28, 2008, PA Judkins and Dr. Prust reported that there was "a little swelling . . . probably consistent with sprain-strain in the ankle" caused by a recent motor vehicle accident.  AR at 455.

Dr. Prust identified her symptoms and signs as: burning, aching or searing pain initially localized to the site of injury; increased sensitivity to touch; joint stiffness; restricted mobility; muscle spasm; impaired appetite; abnormal sensations of heat or cold; muscle pain; muscle atrophy; impaired sleep; and chronic fatigue.  *Id.* at 194.  There is no evidence in the medical records, however, of impaired appetite, muscle atrophy, or chronic fatigue.

Inclusion of Dr. Prust's 2013 medical source statement would, at most, result in an

evidentiary conflict in the record that could be resolved either for or against the claimant. The medical source statement itself, however, is not consistent with Dr. Prust's own medical records.  As such, the Court finds that the information presented to the Appeals Council did not change the evidentiary record.  "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

## 2. Lay Witness Testimony

The Ninth Circuit Court of Appeals has unequivocally stated that "competent lay witness testimony '***cannot*** be disregarded without comment,' *Nguyen* [*v. Chater*], 100 F.3d [1462,] 1467 [(9th Cir. 1996)], and that in order to discount competent lay witness testimony, the ALJ 'must give reasons that are germane to each witness.' *Dodrill* [*v Shalala*], 12 F.3d [915,] 919 [(9th Cir. 1993)]."  *Molina*, 674 F.3d at 1114 (emphasis in original); *see also Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009).

Here, the ALJ addressed the statement submitted by Plaintiff's husband Robert Marshall, dated February 2003.  AR at 31.  The ALJ gave this statement "limited weight" noting that "the limitations are not substantiated by the overall medical evidence and activities of daily living."  *Id.*  Inconsistency with medical evidence is a germane reason for discrediting lay witness testimony.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005).  Dr. Prust's medical source statement does not change this assessment.  *See* Section III.B.1., *supra*.

. . .

1

2

### 3. Residual Functional Capacity

3

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in

4

the record, including, *inter alia*, medical records, lay evidence, and 'the effects of

5

symptoms, including pain, that are reasonably attributed to a medically determinable

6

impairment.' *See* SSR 96–8p, 1996 WL 374184, at *5; accord 20 C.F.R. §§

7

404.1545(a)(3), 416.945(a)(3)." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir.

8

2008).  Here, the ALJ properly weighed Plaintiff's testimony, the statement of Plaintiff's

9

10

husband, and the medical evidence and derived the RFC from this analysis, as well as

11

John Fahlberg, M.D.'s review of Plaintiff's medical records.  *See* AR at 29–32, 74–76.

12

"[T]he key question is not whether there is substantial evidence that could support

13

a finding of disability, but whether there is substantial evidence to support the

14

15

Commissioner's actual finding that claimant is not disabled." *Jamerson v. Chater*, 112

16

F.3d 1064, 1067 (9th Cir. 1997).  Although the limitations Dr. Prust places on Plaintiff

17

are greater than those outlined in the ALJ's RFC finding, "an ALJ need not accept the

18

19

opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by

20

clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing

21

*Tonapetyan v. Halter,* 242 F.3d 1144, 1149 (9th Cir.2001)).  As discussed in Section

22

23

III.B.1., *supra*, Dr. Prust's 2013 medical source statement is inconsistent with his own

24

medical records and the clinical evidence as a whole.   The Court finds that the

25

information presented to the Appeals Council did not change the evidentiary record.

26

"Where the evidence is susceptible to more than one rational interpretation, one of which

27

28

supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*,

278 F.3d 947, 954 (9th Cir. 2002).

**IV.    CONCLUSION**

"All that Marshall is requesting in this case is that it be remanded to the ALJ, so the ALJ can [evaluate Dr. Prust's 2013 medical source statement] under the *Garrison* guidelines."  Pl.'s Reply (Doc. 22) at 2.  For the reasons discussed above, the Court denies Plaintiff's request and affirms the Commissioner's decision.  Accordingly, IT IS HEREBY ORDERED that:

1)    Plaintiff's Opening Brief (Doc. 12) is DENIED;

2)    The Commissioner's decision is AFFIRMED; and

3)    The Clerk of the Court shall enter judgment, and close its file in this matter.

Dated this 21st day of March, 2016.

Honorable Bruce G. Macdonald
United States Magistrate Judge